**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**Melvin Leroy TYLER,**
**Defendant-Appellant.**

**No. KCD 29846.**

Missouri Court of Appeals,
Western District.

Sept. 4, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 1979.

Application to Transfer Denied
Nov. 14, 1979.

Gary M. Oxenhandler, Columbia, for defendant-appellant.

John Ashcroft, Atty. Gen., Jefferson City, Hope E. Thurrott, Sp. Asst. Atty. Gen., Kansas City, for plaintiff-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

The defendant Melvin Leroy Tyler was convicted after jury trial in the Circuit Court of Platte County of robbery in the first degree, of rape, of kidnapping, and of armed criminal action. As a second offender, he was sentenced by the court to the following terms in the Department of Corrections, to be served consecutively: Robbery, 75 years; rape, 75 years; kidnapping, 10 years; and armed criminal action, 25 years.

From this judgment the defendant has appealed to this court.

Broadly stated the facts are as follows:

Defendant forced his way with a handgun into N. K.'s house in Columbia, Missouri, shortly after 3:00 o'clock on the afternoon of December 27, 1976. N. K. was in the house with her 13-year-old autistic daughter, Mary. Her 10-year-old son, Thomas, was playing outside the house. Defendant struck N. K. with the gun, opening a gash in her scalp, and with his fist. He also struck Mary, causing a gash in her forehead. Defendant robbed N. K. of her jewelry and $26 money, raped her, and abducted her in her own car.

Within a few minutes defendant released N. K. in Columbia, near, as it happened, the office of Dr. See, her gynecologist. She ran to Dr. See's office and reported the incident. She was treated for her wounds and examined. A vaginal examination at this time revealed live sperm in her vagina.

N. K. identified defendant from photographs shown her by the police two days later, and the following day identified him in a lineup in Kansas City.

Defendant put forward an alibi defense, claiming to have been in Kansas City when the offense occurred. He did not testify, but presented several witnesses in support of his defense.

Other details will be stated as required in the course of the opinion.

1. Appellant says the court erred "in not dismissing the charges against the appellant because of the omission of citations to sections of the Missouri Revised Statutes in the prosecutor's affidavit as required by Rule 24.01(a)."

■ Rule 24.01(a), however, relates only to informations and indictments, and the requirement that the section number of the statutes which proscribes the conduct and which fixes the penalty is not applicable to the original complaint or, as it is denominated in the transcript and in appellant's brief, the "affidavit".

The point is disallowed.

■ 2. Defendant contends the court erred in permitting him to waive counsel without his having filed the written waiver called for by § 600.051, RSMo 1978. The use of this writing has been held to be mandatory. *Peterson v. State,* 572 S.W.2d 475 (Mo. banc 1978).

The court, however, did not permit defendant to waive counsel nor did defendant actually waive counsel. In a pre-trial hearing in camera, held May 26, 1977, the court presided over a lengthy conference attended by the defendant, by prosecuting attorney Harper and by defendant's court-appointed attorneys, Gary Oxenhandler and Marvin Tofle, and by public defender William Mays and assistant public defender David Doak.

The court and the prosecuting attorney closely questioned the defendant who demonstrated an unusual knowledge of criminal law. The discussion centered upon whether he would be permitted to conduct his own defense, which is a different thing from waiving counsel. *United States v. Hill,* 526 F.2d 1019 (10th Cir. 1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976); *State v. Burgin,* 539 S.W.2d 652, 654 (Mo.App.1976). The court attempted to dissuade defendant from conducting his defense. Defendant at one point said, "I am confronted, like I told Mr. Harper and Gary, I am confronted with representing myself and my own subjective feelings, when you get an innocent person to stand up and say you're guilty, he gets emotionally involved and that is why it's a good thing to have counsel, because there will be times during this trial I can't do it alone."

The upshot of the conference was that the court announced: " . . . I am going to allow him to represent himself.

"However, gentlemen, Mr. Oxenhandler and Mr. Mays, you will be required by this court to stay through the course of this trial to advise and counsel Mr. Tyler and lend whatever assistance he deems you can to his advantage."

Defendant had the assistance of counsel throughout, including the aid of appointed local counsel, who assisted until the jury was selected. He conferred with them often throughout the trial, as shown by recesses for that purpose. They conducted the voir dire examination of the jury panel. They actively participated in pre-trial and post-trial proceedings and have filed a brief in this court.

The requirement of § 600.051 that a written waiver be signed by defendant has no application in this situation, and the court did not err in proceeding as he did without securing the same.

■ 3. Defendant complains that the regular judge of the Circuit Court of Platte County, Judge Yeaman, signed the order to the sheriff to summon additional jurors from among the bystanders, a procedure prescribed by § 494.250, RSMo 1978. He says it should rather have been signed by Judge Kinder, who had been appointed by the Supreme Court to hear the case when Judge Conley had been disqualified.

Defendant makes no attempt to show any prejudice to his cause because of Judge Yeaman's signing the order and none is apparent. In the absence of some showing of prejudice stemming from failure of strict compliance with § 494.250, substantial compliance is sufficient. *State v. Pettis,* 522 S.W.2d 12, 15–16 (Mo.App.1975); *State v. McGill,* 510 S.W.2d 782, 783 (Mo.App.1974). We find no prejudicial error in the procedure.

4. In another rather ambiguous allegation of error, appellant says the trial court erred "in requiring the appellant to exercise his peremptory challenges because no proper determination had been made that there was a qualified jury panel."

Platte County Sheriff Tom Thomas testified that he had summoned an additional dozen jurors "from the street", referring to the "bystanders", § 494.250, RSMo 1978. He said he did not feel it was his responsibility to determine if they were qualified jurors.

The selection of the "bystander" jurors was actually done by a deputy sheriff. There were twelve jurors so selected, the sheriff said. However, the jury panel at the beginning of the trial numbered forty-one, including nine who were not on the original list of jurors and alternates selected by the jury commission. Only one of that nine was on the jury at the time it retired to deliberate. Another had been selected as an alternate juror, § 494.065 RSMo 1978, and had been excused before the jury retired to deliberate.

■■ The defendant, it is true, was entitled to a qualified panel from which he could make his dozen strikes from amongst qualified jurymen, so as not to use any of his peremptory challenges to eliminate unqualified persons. The defendant has a right on voir dire to inquire about statutory qualifications and may challenge for cause upon that basis. *State v. Brown,* 547 S.W.2d 797, 799–800 (Mo. banc 1977); § 546.210 RSMo 1978.

■ In this case there is no evidence at all, and defendant does not contend, that any member of the jury panel was not fully qualified under § 494.010, RSMo 1978. The court will not presume irregularity in this matter, but rather will presume in the absence of evidence that the jury was legally and properly constituted of qualified persons. *McCormack v. McNamee,* 274 S.W.2d 272, 274–5 (Mo.1955).

■ Even should it have developed, at least after verdict, that a juror was not technically qualified—say by reason of residence, or by reason of age, as in *State v. Barr,* 20 S.W.2d 599 (Mo.App.1929)—the verdict will not be set aside unless the rights of the appellant were prejudiced and substantial injustice resulted. *Eastman Kodak Stores, Inc. v. Summers,* 377 S.W.2d 476, 482 (Mo.App.1964).

Defendant's point is rejected.

■ 5. Defendant complains of the trial judge's suggestion to the prosecuting attorney as the prosecuting attorney was attempting to identify for admission into evidence the bloodstained blouse worn by N. K. at the time of the assault upon her. Witness Deputy Sheriff Chris Egbert had identified State's Exhibit No. 2 as "the blouse I took from (N. K.) on December 27." The prosecuting attorney then offered Exhibit No. 2 in evidence, and the defendant objected on the ground that "there is no chain of custody", which objection was sustained by the court. The court then asked if the witness could testify what he did with it from the time he got it. "What did you do with it?" the court asked, apparently addressing himself to the witness. Then turning to the prosecuting attorney the court said: "Establish this is the condition it was in, lay your foundation."

The foundation laid, Exhibit No. 2 was at length admitted into evidence.

Defendant treats this as "aiding the state to lay a foundation . . . thus indicating bias and prejudice on the part of the trial court."

The court's explaining what he required as a foundation for admitting the blouse into evidence was a permitted practice, and it did not indicate any partiality of the

court to the state's side of the case. *State v. Phelps,* 478 S.W.2d 304, 310 (Mo.1972); *State v. Farmer,* 536 S.W.2d 748, 750 (Mo. App.1976). We do not find in the record another instance where the court intervened in this fashion to aid the prosecuting attorney. The single instance of giving some guidance or direction to the prosecuting attorney would not indicate any partiality toward the state. *See State v. Neal,* 476 S.W.2d 547, 550–1 (Mo. banc 1972).

6. Defendant's next complaint is aimed at an unfortunate remark of the trial judge during the examination of defendant's alibi witness, Eddie Paul Roush. Defendant was trying to elicit from the witness that he, the witness, had been intimidated by law enforcement officers for testifying in the case. The witness said, "I was questioned for the first time at the honor farm at the Missouri State Penitentiary, Church Farm, and I gave my statement . . ." Later in his testimony, while they were still on the same subject, the following exchange took place among the court, the defendant and prosecuting attorney Harper:

Q. (By Mr. Tyler) Eddie, you say you talked to an officer at the Church Farm. Would you describe the Church Farm; what is the Church Farm?

A. It's a farm—

MR. HARPER: I object to what Church Farm is.

THE COURT: Sustained.

Q. (By Mr. Tyler) Were you in prison when you talked to the police officers?

A. No, I wasn't.

MR. HARPER: I object to that.

THE COURT: What is the purpose of that?

DEFENDANT TYLER: I want to show what transpired when he found out he was going to be a witness.

THE COURT: Fine, he was at the Church Farm which is an institution under the control of the Division of Corrections.

DEFENDANT TYLER: The jury don't know.

THE COURT: Would you stipulate the Church Farm is an institution under the control of the State Division of Corrections.

MR. HARPER: Certainly.

DEFENDANT TYLER: And that it is a honor camp.

MR. HARPER: It is not an honor camp, it's a part of the penitentiary.

THE COURT: You and I both know it's not an honor camp. The only place characterized as an honor camp is Fordland.

DEFENDANT TYLER: May we approach the bench?

THE COURT: Yes.

(Counsel approached the bench and the following proceedings were had:)

DEFENDANT TYLER: I object to the statement you made.

THE COURT: Your characterization is wrong.

DEFENDANT TYLER: The statement I, and "I know about it."

THE COURT: I am talking about all of us. I am talking about you and I and Mr. Harper.

DEFENDANT TYLER: It's a part of the prison and it implies that I was in prison. I move for a mistrial.

THE COURT: Overruled. Stay within the record.

The defendant's only criticism of the court's statement at the time, or in his motion for a new trial, is that it indicated to the jury that the defendant had been in prison.

The trial judge's remark would not necessarily have been taken by the jury to indicate defendant had a prison record. Defendant's knowledge of the status of Church Farm could have come from other sources than his personal experience as an inmate of the penitentiary. Defendant's alibi witnesses included ex-convicts and present convicts. Another of defendant's witnesses, who testified to seeing defendant at the Halfway House in Independence, Missouri, at about 2 o'clock in the morning

of December 28, and to defendant's having had an injury to his hand at that time, was the director of the Independence Halfway House.

■ We agree the court must take pains to maintain a neutral stance, and by no means to indicate his belief as to defendant's guilt or innocence, *State v. Drew,* Mo., 213 S.W. 106 (1919), or his disbelief of defendant or defendant's witness. *State v. Tash,* 528 S.W.2d 775, 782–3 (Mo.App.1975). We take into account that the question of Church Farm's being an honor farm or not was a point of no importance, and the exchange amongst the participants was scarcely more than bickering. We cannot imagine that it had any influence upon the outcome of the case. *State v. Cox,* 352 S.W.2d 665, 672 (Mo.1961); *State v. Tash, supra.*

■ Defendant asked only for the drastic remedy of a mistrial, which the court denied. Defendant did not ask for a less radical remedy. The court's discretion in refusing to grant a mistrial is honored on appeal except where discretion is abused. *State v. Duncan,* 499 S.W.2d 476, 479–480 (Mo.1973). The incident does not require a reversal. Defendant's point is disallowed.

■ 7. Defendant complains of the failure of the court to instruct upon the subject of attempted rape. N. K.'s description of the actual completion of the rape was somewhat equivocal. After requiring her to lie upon the couch, defendant had made three unsuccessful attempts to insert his sexual organ into hers. He then bent her legs upward "so forcefully I could feel my knees touch my shoulders" and lay down on her again. She testified: "His genital area was right opposite mine. I could not tell (if there was an erection or not). All I knew was that his penis was no longer outside of my body and it was not touching the outside of my body as it had on the three previous attempts . . . He was rocking back and forth on top of me in a sexual manner and breathing heavily like in a sexual manner . . ." Upon a vaginal examination, Dr. See, as earlier stated, found live sperm. He said this would have had to be deposited within the previous twenty-four hours. N. K. said she had not had intercourse for at least four weeks.

In her initial report to the police, N. K. had stated that she was not sure whether penetration had occurred, and she had described the assault to Dr. See's receptionist as an attempted rape.

We are faced here with § 556.160, RSMo 1969 (repealed by Laws 1977, p. 658, S.B. No. 60, § 1, which enacts the Criminal Code, effective January 1, 1979), which reads as follows:

"No person shall be convicted of an assault with an intent to commit a crime, or of any other attempt to commit any offense, when it shall appear that the crime intended or the offense attempted was perpetrated by such person at the time of such assault or in pursuance of such attempt."

The decisions of the Supreme Court of Missouri, by which we are bound, Mo.Const. Art. V, § 2; *State v. Hegwood,* 558 S.W.2d 378 (Mo.App.1977), hold that this statute means that if there is *substantial evidence* the crime was completed, the defendant is not entitled to an instruction on attempt. Referring to the above statute, our Supreme Court in *State v. Gadwood,* 342 Mo. 466, 116 S.W.2d 42, 55 (1938), said:

"The words in the statute 'when it shall appear' do not mean when it shall appear conclusively or without dispute; they mean when it shall appear from substantial evidence . . . In the instant cause the State made a prima facie case of murder. That being so, the appellant was not entitled to an instruction on felonious assault."

Similar language was used in *State v. Baker,* 276 S.W.2d 131, 134 (Mo.1955) where the court said:

"[I]f substantial evidence shows the crime charged was consummated the defendant cannot be convicted of a mere *attempt.* He cannot go to the jury on a charge so light in the face of a prima facie case showing the graver offense

was committed, [citation omitted] but must take the hazard of the severer, greater punishment, as in the case of rape."

See also: State v. Grant, 394 S.W.2d 285, 289–290 (Mo.1965); State v. Adams, 380 S.W.2d 362, 370 (Mo.1964); State v. King, 342 Mo. 975, 119 S.W.2d 277, 284 (1938).

This point, too, is disallowed.

8. Defendant attacks the ruling of the trial court in overruling his motion to dismiss Count 6, charging armed criminal action. The motion was based upon the idea that the accusation and trial for armed criminal action in addition to the accusation and charge of first degree robbery by means of a dangerous and deadly weapon, to wit, a pistol, would constitute double jeopardy in violation of Article I, Section 19 of the Missouri Bill of Rights and the Fifth and Fourteenth Amendments to the Constitution of the United States.

■■■ Defendant says the case is not ruled by State v. Treadway, 558 S.W.2d 646 (Mo. banc 1977), where the defendant—as in this case—committed robbery by use of a pistol and was charged with first degree robbery under § 560.120, RSMo 1969, and with armed criminal action under § 559.225, RSMo Supp. 1976. The Supreme Court of Missouri held that this was not a violation of the rule against double jeopardy. It pointed out that Missouri follows the "separate or several offense" rule rather than the "same transaction" rule. One may be guilty of several offenses, though they arise out of the same "transaction, incident or set of facts". The use of a dangerous and deadly weapon is not an element of first degree robbery, which requires only charge and proof of "violence to his person, or by putting him in fear of some immediate injury to his person." § 560.120. The use of a dangerous or deadly weapon, on the other hand, is an element of the crime of armed criminal action defined by § 559.225. Applying the test set forth in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), "A single act may be an offense against two statutes; and if each statute requires proof of an

additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other," the court found that double jeopardy did not prevent prosecution for both armed robbery with a gun and armed criminal action.

Defendant says the point that distinguishes the present case from Treadway is that in the present case defendant was specifically charged with robbery "by means of a dangerous and deadly weapon, to wit, a pistol" and the verdict-directing instruction required the finding of that fact. We cannot tell whether that language was used in the accusation and the instructions in Treadway.

■■■ Defendant's point would have had more validity when § 560.135, RSMo 1969, called for enhanced maximum punishment, i. e., death, when a dangerous and deadly weapon was used in connection with the robbery. Since the 1975 amendment of the section, however, as noted in Treadway, supra, at 652, there is no distinction in any way whether a dangerous and deadly weapon is used. If that language is used in the information or in the instructions, it merely describes the means of violence or of putting the victim in fear, rather than stating a necessary element of the crime.

■■■ We hold that the distinction suggested by defendant is not significant, that Treadway is controlling in the present case and that it rules defendant's double jeopardy point against him.

The foregoing points are contained in a brief filed for appellant by counsel. Appellant has himself filed a voluminous brief, pro se, which the Attorney General with great industry has commendably answered. We shall now deal with the points presented by the pro se brief:

■■■ 9. Defendant says that it was error to admit the testimony of Dr. See of the presence of live sperm in the vagina of the victim when she was examined shortly after the alleged rape. Under this point defendant argues as the reason for rejecting the

testimony, that no test was made of the sperm to determine the blood type of its source. Dr. See said he knew of no available test for that purpose. There was no other testimony that such a test could be made.

The testimony of Dr. See on this point is so plainly admissible as to call for no discussion or citation of authority.

10. Appellant says he should be granted a new trial on the basis of newly discovered evidence. In a supplemental motion for a new trial, supported by his affidavit and his own testimony upon the hearing on the motion for a new trial, defendant says that Ralph Peterson, his wife Mary Peterson, his daughter Chris and one Laura Harmon would testify that he, the defendant, had entered the Peterson residence in St. Louis at 9 o'clock or 10 o'clock a. m. on December 27, 1976—the day of the alleged attack upon N. K. in Columbia that afternoon— and that at that time he had scratches and "welps" on his face. This testimony had been given on September 20, 1977, by Ralph Peterson in a case against defendant in St. Louis, which was the occasion of defendant's learning about it.

N. K. had testified at the trial that defendant's complexion on the day of the crime "had a sort of ruddy look to it as if he was a person who had been outdoors quite a bit", and on cross-examination had stated that he had no scratches on his face.

The matter of granting a new trial on the basis of newly discovered evidence is within a fairly broad discretion of the trial court. *State v. Riley,* 536 S.W.2d 501, 505 (Mo.App.1976). The trial court's decision denying a new trial on that ground is not disturbed where the new evidence is cumulative or where it is not so material as likely to produce a different result. *State v. Terry,* 472 S.W.2d 426, 431 (Mo. banc 1971); *vacated on other grounds,* 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972); *State v. Brotherton,* 266 S.W.2d 712, 718 (Mo.1954); *State v. Riley, supra.*

In this case, the trial court was well within his discretionary boundaries in denying a new trial. The supposed newly discovered evidence was cumulative to that of two other witnesses that the defendant had several scratches on his face—Fred Garrett, who said he had seen the defendant in Kansas City between 1 o'clock and 2 o'clock in the afternoon on December 27, and Eddie Roush, who claimed to have seen the defendant at 4:00 or 4:30 on the same day in Kansas City.

Actually, Chris Peterson, described as a "young lady", had been at the defendant's trial in Platte County to testify for the state. Defendant had objected, insisting he had not been furnished grand jury minutes and other statements of the witness. He had interviewed her that morning. The state intended to call her to testify that on the morning of December 27, 1976, she had seen defendant in her home in St. Louis wearing a plaid CPO or lumbermen's style jacket. The court sustained defendant's objection and did not allow her to testify. If her testimony of the scratched face aided defendant, it seems her other testimony would have aided the state more. It would have shown the defendant crossing the state from St. Louis to Kansas City on that day, with Columbia on the most direct route. It would have corroborated N. K.'s identification by describing defendant's coat as the same kind, color and pattern. It is unlikely that the testimony of the Petersons would have produced a different outcome of the trial.

Defendant's point is denied.

11. Defendant contends that his oral motion to disqualify Judge Kinder should have been sustained. In his brief here, he challenges Judge Kinder's authority in the case.

The case originated in Boone County and was removed to the Circuit Court of Platte County on application for change of venue. The Supreme Court transferred Honorable Frank Conley, Judge of the Thirteenth Judicial Circuit, to the Sixth Judicial Circuit to hear the case. The defendant then disqualified Judge Conley and the Supreme Court transferred Judge Kinder, Judge of the Nineteenth Judicial Circuit, to the Sixth Judicial Circuit to hear the case.

The defendant, when Judge Kinder was assigned to the case, after acknowledging that he could not file a second disqualification, stated orally to the court: "Your Honor, I feel that I can't get a fair trial before you because of the past experiences that we had."

The court replied: "Mr. Tyler, the only past experience we had was when I refused to let you practice law in my court." The defendant began to refer to an incident occurring in 1968 when Judge Kinder was prosecuting attorney, but withdrew his objection after conferring with his attorney, Mr. Oxenhandler. The court later returned to that subject, and the defendant said that Judge Kinder was investigating a murder case in the Missouri penitentiary in 1968 and had interrogated defendant in the warden's office. Defendant had denied being a witness to the alleged murder and "certain remarks were made backwards and forwards, refusing to give information in this case which I was allegedly seeing the murder." The judge stated that he had no recollection of the incident and remembered only that he would not allow the defendant to practice law in his court because he didn't possess a law license. The judge noted he had required the defendant to leave the attorney's portion of the courtroom. The court continued: "I bear you no ill will and I have no feelings about you one way or the other. I assure you you will have a fair trial."

Judge Kinder's authority rests upon the order of the Supreme Court transferring him to hear said cause. The procedure followed was that prescribed by Rule 30.13 which gives the disqualified judge the option to notify the Supreme Court that the transfer of a judge is required. This course was followed by Judge Conley. The Supreme Court's order transferring Judge Kinder was forthcoming and is included in the transcript here. The Supreme Court order vested Judge Kinder with jurisdiction to try the case. Mo.Const. Art. V, § 6; *State ex rel. Ellis v. Creech*, 364 Mo. 92, 259 S.W.2d 372 (Mo. banc 1953).

As to the oral motion to disqualify Judge Kinder for personal bias and prejudice against the defendant, such motion is addressed to the court's discretion. *State v. Thost*, 328 S.W.2d 36, 39 (Mo.1959); *State v. Words*, 559 S.W.2d 63 (Mo.App.1977). Of course, if the motion has even colorable substance, a judge is well advised to disqualify himself and request the transfer of another judge to try the case. *State v. Words, supra.* In this case, however, the defendant's request and his suggestion of bias and prejudice on the part of the trial judge had no substance and the trial judge was correct in denying the request. Lawyers and judges will at once recognize that the sort of incidents mentioned by the defendant would not excite in a judge's breast any feelings of personal animus or hostility. Nothing in the trial court's deportment throughout the trial indicates any bias or prejudice on the part of the court, but instead demonstrates an evenhandedness in dealing with the defendant.

Defendant also says that the court should have disqualified the prosecuting attorney, Mr. Harper, because of his alleged bias and prejudice against defendant. Defendant's evidence in support of the motion consisted of the testimony of the Boone County prosecuting attorney, Milton Harper, whose testimony was that the defendant had filed various lawsuits against him. These included numerous "1982"[1] actions in several courts, and numerous lawsuits in Boone County. The prosecutor said, "I believe you also sued the sheriff, deputy sheriff, half the jailers and half the deputies, some judges in St. Louis, all the circuit attorneys and all the judges in St. Louis County, and I guess I am in on that suit." Defendant said he had fourteen or fifteen lawsuits pending.

It was not shown that any of the litigation initiated by the defendant would be affected by the outcome of the instant case. While it is generally true that the prosecutor's personal animus against a

---

1. Presumably 42 U.S.C.A. § 1983 is intended.

defendant disqualifies him from prosecuting, § 56.110, RSMo 1978; *State v. Harris*, 477 S.W.2d 42, 44–45 (Mo.1972), there is no such hostility shown on the part of prosecutor Harper. In the case now before us the defendant could paralyze the prosecution if he could secure the disqualification of prosecutors and other law enforcement officials by the simple expedient of filing a lawsuit against them. The defendant is well known to the state and federal courts of Missouri. His history of litigiousness indicates this course is one which would occur to defendant, and he is capable of filing suits without the aid—and responsible restraint—of counsel.

The trial court was within its discretion in denying defendant's motion to disqualify the prosecutor. *State v. McIntosh*, 333 S.W.2d 51, 58–59 (Mo.1960).

 12. The defendant complains that the trial court erred in admitting into evidence a bloodstained blouse which the victim, N. K., was wearing at the time of the attack upon her. Defendant says there was no "chain of custody" proved as a foundation for its admission.

Officer Chris Egbert of the Columbia Police Department identified the blouse as the one he took from N. K. on the day of the offense. He said that the blouse was in the same condition as when he obtained it and that it was tagged, marked and placed in the evidence locker, where it had remained until the trial. N. K. herself identified the blouse as the one she was wearing at the time of the assault.

The foundation was sufficient and the exhibit was properly admitted in evidence.

 13. Defendant says the court erred in refusing to suppress the pre-trial identification of defendant by N. K. and her son, Thomas, "because such procedures employed by the police were so unnecessarily suggestive and conducive to irreparable mistaken identification". Two days after her attack, N. K. identified defendant from photographs brought to her Columbia home by the police, and next day identified defendant in a lineup at Kansas City. In the

circumstances of this case, we see no possibility of mistaken identification growing out of suggestive procedures.

The photographs exhibited to N. K. and to Thomas two days after the crime were full-face and profile views of five white men roughly similar in age and physical appearance. The Kansas City lineup was of five white men. Although two of them had mustaches, the other three—including defendant, identified as the assailant—were cleanshaven and otherwise without gross differences in appearance. Defendant was in the presence of N. K., both at close range and several feet removed from her, in broad daylight, for the space of several minutes. The procedures were not so suggestive as to cause mistaken identification, and the jury was entitled to consider the pre-trial identifications which defendant says should have been suppressed. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Degraffenreid*, 477 S.W.2d 57, 62 (Mo. banc 1972); *State v. Parker*, 458 S.W.2d 241, 243–4 (Mo.1970); *State v. Holmes*, 389 S.W.2d 30, 34 (Mo.1965); *State v. Terry*, 582 S.W.2d 337 (Mo.App.1979); *State v. Jenkins*, 516 S.W.2d 522, 526 (Mo. App.1974).

Likewise Thomas had a good opportunity to view the defendant in daylight outside their house and he too identified the defendant from photographs shown to him at his home.

The court was correct in denying suppression of the out-of-court identification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

14. Defendant alleges error in the court's denial of his oral motion, during the trial, to quash the entire jury panel. In support of the motion he called as a witness Mr. Leslie E. Dyer, the circuit clerk of Platte County, who testified that he, the circuit clerk, was a defendant in a habeas corpus proceeding filed by defendant. Because of this, since the circuit clerk was a member of the jury commission which selected the jury panel, § 494.230, RSMo 1978, the defendant moved that the jury panel be quashed. Actually, according to circuit

clerk Dyer's testimony, it was a deputy circuit clerk, Mrs. West, who participated in the selection of the jury panel as a member of the jury commission.

■ It was not shown whether the habeas corpus proceeding had been filed at the time the panel was selected by the jury commission. Even had the proceeding been filed, that alone would not show any bias on the part of the circuit clerk which would have disqualified him from serving as a member of the jury commission. *State v. Henson,* 552 S.W.2d 378, 382 (Mo.App.1977). No prejudice is shown to the defendant. The point is overruled.

■ 15. Defendant complains that the trial court "forced appellant to make objections in the hearing of the jury". No specific instance is pointed to, but appellant seems to be complaining of the general rule that objections to evidence are required in order to preserve for review any error in the admission of the evidence. *State v. Lang,* 515 S.W.2d 507, 511 (Mo.1974).

The point is denied.

16. Defendant claims error on the part of the trial court in two instances during the deliberations of the jury, which he claims entitle him to a new trial.

The first incident is as follows: After the jury had been deliberating two hours and twenty-two minutes, they were brought into the courtroom. They had apparently sent in two written questions to the court, regarding two photographs of the defendant. The judge advised them that he could not answer the questions. Jury foreman Miller said: "I don't know what the proceedings are at this time in—I am not satisfied, Your Honor, with what has been presented to me in the pictures and I cannot—I don't know—could I talk to you in your chambers?"

The court replied that he could not do that, an action which defendant claims was error.

■ Any private conference between the judge and any jury during the course of the deliberations would have been entirely improper. *State v. Jones,* 363 Mo. 998, 255 S.W.2d 801, 806 (1953); *State v. Phillips,* 508 S.W.2d 240, 242 (Mo.App.1974); 89 C.J.S. Trial § 473 (1955).

■ The next complaint is that "a deputy sheriff . . . invaded the providence and solitude of the jury during their deliberations."

This is unsupported by the record.

Defendant's point is overruled.

17. Defendant says the court erred "in denying the motion to suppress evidence of identification, which evidence was obtained while he was being held beyond the permitted twenty-hour period and before charges were filed."

The defendant's brief does not tell us what evidence he is talking about. The police did secure defendant's plaid coat and a daily activities ledger from defendant's place of residence after he was arrested and while he was being held. Whether that was within or without the twenty-hour period of § 544.170, RSMo 1978, the record does not show. The prosecuting attorney said he did not intend to offer those items in evidence and the court accordingly suppressed them. No error here. Our treatment of this point does not imply that violation of § 544.170 would furnish any ground for suppression of evidence obtained during the excess period. *See United States v. Rose,* 541 F.2d 750, 756 (8th Cir. 1976); *cert. denied* 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977); *State v. Pughe,* 403 S.W.2d 635, 639–640 (Mo.1966); *State v. Bridges,* 349 S.W.2d 214, 218 (Mo.1961).

■ 18. Appellant says that he was denied "access to an adequate law library prior to the trial and pre-trial motions and proceedings".

This claim is without support in the record. It may be, as argued by the Attorney General, that defendant's having "adequate assistance from persons trained in the law" would compensate for unavailability of a law library, *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), but however that may be, defendant was offered the use of the prosecutor's law library

for from four hours to seven hours per day, an offer he rejected. This offer was made on May 17, approximately two weeks before the commencement of the trial.

After the trial appellant used the prosecutor's library for approximately thirty hours. A part of the time between defendant's arrest and trial he was kept in the Jackson County jail, where a law library was available to him, according to the evidence. He was kept in other jails, including the St. Louis County jail, and the record does not disclose which of those jails afforded him access to law libraries.

Defendant has shown no prejudice to his cause in this connection, and the point is overruled.

■ 19. Defendant complains of the court's overruling his motion to strike the testimony of Thomas, the son of N. K., because the state had failed to furnish to the defendant the notes or memoranda of Thomas's description given by him to a policeman when he first reported the incident. According to Thomas's testimony, he had run to the next-door neighbor's house, who called the police. When a policeman arrived, Thomas gave him a description of the man, and the policeman wrote it down. The policeman's notes were not furnished defendant upon discovery.

The prosecuting attorney told the court that the state had furnished to the defendant every police report from the Columbia police file and they were unable to locate any such written report. They were unable even to determine which officer had talked with the youngster. The state had, however, informed the defendant, in response to his request for discovery, what they expected the testimony of the witness would be.

With this explanation, the court overruled the defendant's motion to strike Thomas's testimony.

The court's ruling was correct. The court was satisfied that the state had made a good faith effort to locate any memoranda of Thomas's description of his mother's abductor, and apparently none existed. The state had informed the defendant what Thomas's testimony would be. This was sufficient to comply with Rule 25.32. *State v. Broyles,* 559 S.W.2d 614 (Mo.App.1977).

■ 20. Defendant by pre-trial motion sought a pre-trial photographic lineup of penises, including his own, to be viewed by N. K. The court rejected this startling proposition, and defendant assigns that ruling as error.

Upon N. K.'s cross-examination at the trial, it appeared that she had a brief view of her attacker's penis.

Defendant did not suggest, nor did N. K., that his sexual organ had any distinctive features which would have impressed it upon the visual memory and which would have made it distinguishable from others. The suggested procedure would have had no value and the court correctly denied the motion. Defendant cites us to no cases which remotely support his position.

21. Grant Grinham and Linda Grinham testified that they had talked with the defendant on the telephone during the afternoon of December 27, 1976. The defendant complains that the court did not permit them to testify as to the contents of the conversation.

■ The facts of the conversations were admissible in support of defendant's alibi defense, but the contents of the conversation were not admissible because, as the court ruled, that was hearsay. *State v. Nimrod,* 484 S.W.2d 475, 479 (Mo.1972).

■ 22. Defendant filed a pre-trial motion to dismiss upon a variety of grounds, including "for proceeding with dirty hands of the prosecutor, and police allowing intimidation, threating (sic), and harassment of the defendant's alibi witnesses and evidence". The denial of this motion is urged as a grounds for reversal.

There was a lengthy hearing on the motion. Defendant called eleven witnesses. Six of them denied being threatened or abused by the police. The remaining five were convicts who were imprisoned in the penitentiary at the time of the trial. One of them said he was threatened with parole

revocation if he testified for appellant, and was the object of obscene epithets. A second said that after he talked with police two detainers were issued from Johnson County, Kansas. A third claimed he was harassed by the police after saying he would testify for the appellant. A fourth stated he was beaten but did not know the cause for the beating. The fifth said he had been subjected to arbitrary moves in the penitentiary, although he did not attribute these moves to being a witness for the appellant.

We do not reach the question whether the ground of the motion could under any circumstances be grounds for dismissal, *United States v. Banks*, 374 F.Supp. 321, 333–336, and 383 F.Supp. 389, 392–7 (W.D.S.D. 1974), but say that the court was not obliged to give credit to the testimony of defendant's witnesses. The court heard the testimony as a finder of fact, and the burden was upon the defendant to persuade the court of the ground for his motion. The court could disbelieve plaintiff's witnesses and we do not convict the court of error in denying the defendant's motion to dismiss.

■ As another ground for the motion, defendant charges the state with "stealing material evidence from defendant". On the evidentiary hearing it turned out that the evidence supposed to have been stolen were four cassette tapes and a cassette recorder. These had evidently been taken from the defendant's possession while he was in jail in St. Louis, by a jail official. Two of the tapes had been returned to defendant, who had secreted them. The court ordered the return of the others. Later, on June 1 before the trial began, defendant acknowledged that he had gotten the tapes. He said, however, that the prosecutor had gotten hold of the tapes en route to the defendant and "the package is undone and torn open and there is nothing on them tapes". Nowhere does defendant undertake to show what was on the tapes or how they would have aided his cause. There is some suggestion in the record that a part of the tapes related to a case pending against him in St. Louis, having nothing to do with

the present case. The prosecuting attorney said that they had received the box containing two cassette tapes, opened it and looked at it, and had put the lid back on and it was forwarded to Kansas City and received by the defendant. The prosecutor said that neither he nor anybody for the state had listened to the tapes.

The court correctly denied defendant's motion.

■ 23. Defendant complains of the prosecutor's jury argument in which he urged the jury, with reference to part of the testimony of police officer Chris Egbert, to "read between the lines".

Officer Egbert had told two defense witnesses, namely, Linda Smith and Jerry Tettamble, that the appellant's fingerprints were found at the scene of the crime. At the trial he admitted that this was not the case.

The prosecuting attorney was trying to explain the officer's misstatement of fact to the two witnesses. The prosecutor pointed out that no witness's testimony was affected by witness Egbert's "inaccurate statement". The prosecutor said: "He admitted that and I really think all you can try to get out of that, you have to kind of do some reading between the lines, maybe there was some misunderstanding . . . On Officer Egbert's part, you have to read between the lines on that . . . he admitted they were inaccurate. Why? I think you have to read between the lines here, gentlemen."

The meaning of the prosecutor's argument is difficult to figure out, but presumably his meaning was that he could offer no explanation and there was none in the record for the officer's false statement about the fingerprints. The prosecutor was not trying to justify it, and was not suggesting that he had some explanation which would justify the officer and which had not been shown to the jury.

We see no prejudice to the defendant and the point is disallowed.

24. Defendant offered the following instruction, the refusal of which he says was

error: "The court instructs the jury that witness intimidation is against the law in the State of Missouri; if you find and believe there has been witness intimidation in this case, either by the plaintiff or the defendant, you should consider this."

■ The court ruled correctly in refusing this tendered instruction, of course. No penetrating analysis will be attempted here, for the instruction has no common denominator with a proper instruction. But it would have been confusing to the jury, in that they could not tell in what connection they were to consider "intimidation of witnesses". Also, it singled out certain evidence for comment and emphasis. It was argumentative. *See* MAI–CR 2.01, Notes on Use (2); *State v. Lang*, 515 S.W.2d 507, 509–510 (Mo.1974); Rule 20.-02(d); *State v. Bibee*, 496 S.W.2d 305, 314 (Mo.App.1973).

■ 25. Defendant says that he was subjected to double jeopardy when tried for both kidnapping and robbery in the first degree.

First degree robbery is defined by § 560.-120, RSMo 1969, and the crime of kidnapping is defined by § 560.135, RSMo Supp. 1975.

For the same but stronger reasons that permit the prosecution both of first degree robbery and armed criminal action, as earlier discussed herein, the prosecution of armed robbery and kidnapping in this case are permissible without offending the double jeopardy rights of the defendant. *Blockburger v. United States, supra; State v. Treadway, supra.*

■ 26. Defendant claims the trial court erred by refusing defendant the opportunity to examine "affidavits of exemption" for jury panel members.

These had been requested by defendant by a pre-trial motion, along with other records related to the jury panel selection process.

The record shows that there were no such "affidavits of exemption", or similar records, in existence, and the defendant has no

complaint that they were not furnished to him.

The judgment is affirmed.

All concur.